

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| IN RE: RODNEY L. LINCOLN | ) |
| | ) WD79854 |
| Petitioner, | ) |
| | ) OPINION FILED: October 11, 2016 |
| v. | ) |
| | ) |
| JAY CASSADY, Superintendent, | ) |
| Jefferson City Correctional Center, | ) |
| | ) |
| Respondent. | ) |

## ORIGINAL PROCEEDING IN HABEAS CORPUS

Before Writ Division: Gary D. Witt, Presiding Judge, Cynthia L. Martin, Judge and Anthony Rex Gabbert, Judge

Rodney L. Lincoln ("Relator") has filed a petition for writ of habeas corpus requesting the vacation of his 1983 convictions of two counts of first-degree assault and of manslaughter. Relator asserts that newly discovered evidence clearly and convincingly establishes that he is actually innocent, a freestanding claim of actual innocence. Relator also claims that the preponderance of the evidence establishes either the gateway of actual innocence or of cause and prejudice, permitting review of procedurally barred claims that Relator was denied a constitutionally adequate trial.

We conclude that Relator would be unable to sustain his burden to establish the procedurally barred claims that he was denied a constitutionally adequate trial, rendering it unnecessary to determine whether Relator has sustained his burden to establish a gateway to review those claims. Because the Missouri Supreme Court has not recognized a freestanding claim of actual innocence in cases where the death penalty has not been imposed, we are not at liberty to expand Missouri habeas jurisprudence to permit consideration of the claim in this case. Accordingly, Relator's habeas petition is denied.

**Factual and Procedural Background[1]**

On April 27, 1982, Joanne Tate was found dead in her apartment, lying face down in a pool of blood. Tate's daughters, M.D. (then age 7) and R.T. (then age 4), were found in bed, covered in blood, and with multiple stab wounds.

M.D. initially told police that "Bill" was the assailant, and offered other information about Bill's appearance, where her mother had met and spent time with Bill, and the car that Bill drove. Sometime later, M.D. identified Relator as the assailant. At trial, M.D. identified Relator as the assailant. Though Relator is not named "Bill," and did not match the other characteristics about the assailant first mentioned by M.D., M.D. explained during cross examination that she initially told people the assailant was named "Bill" because she was sick and hurt and people kept bothering her for a name.

---

[1]The factual and procedural background is drawn largely, and without further attribution, from *Lincoln v. State*, 457 S.W.3d 800 (Mo. App. E.D. 2014).

2

An expert witness testified at trial that a pubic hair found on a blanket in Tate's room "matched" Relator's hair, and that he had never been involved in a case where a hair recovered from the crime scene matched to more than one person.

The jury convicted Relator of two counts of first-degree assault and of manslaughter. Relator was sentenced to a term of fifteen years' imprisonment on the manslaughter count and of life imprisonment on each assault count, with each term to run consecutively.

In 2005, Relator successively petitioned for DNA testing pursuant to section 547.035.[2] That testing resulted in a stipulated determination that the pubic hair which had been the subject of expert witness testimony at trial did not, in fact, belong to Relator. However, Relator's section 547.037 request to be released from prison was denied because the DNA testing did not establish Relator's innocence, as the "determinative factor" in Relator's conviction was not the expert hair match testimony, but was instead M.D.'s testimony, "the key to the convictions." *Lincoln v. State*, 457 S.W.3d 800, 807-08 (Mo. App. E.D. 2014).

In November 2015, M.D., then 41, recanted her eyewitness identification of Relator as the assailant. M.D. claims that she was traumatized and pressured into identifying Relator as the assailant, and now believes that the assailant was a serial killer whose family

---

[2]Sections 547.035 and 547.037 address post-conviction forensic DNA testing, representing legislatively authorized relief from a final conviction that is distinct from Rule 91 habeas jurisprudence. *McKim v. Cassady*, 457 S.W.3d 831, 842 n.22 (Mo. App. W.D. 2015). All statutory references are to RSMo 2000, as supplemented to the relevant date, except as otherwise noted.

3

owned a Volkswagen repair shop in the area of the crimes. M.D.'s initial reports to the authorities had said that the assailant worked on her mother's car and drove a Volkswagen.

Based on M.D.'s recanted testimony, Relator petitioned the Cole County Circuit Court for a writ of habeas corpus asserting his innocence and that he was deprived of a constitutionally adequate trial. On June 16, 2016, the Cole County Circuit Court denied Relator's petition.

Relator then filed a petition for writ of habeas corpus in this court. We issued our order to show cause to the State, which then filed its response to the writ petition. Relator filed a reply to the State's response.

## Analysis

Rule 91.01(b) authorizes any person "restrained of liberty within this state [to] petition for a writ of habeas corpus to inquire into the cause of such restraint." "[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 545-46 (Mo. banc 2003) (citing *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 214 (Mo. banc 2001)). "Even though the interests protected by the writ are fundamental, relief is limited in order to avoid unending challenges to final judgments." *Id*. at 546. Entitlement to habeas relief has thus been recognized in Missouri when a "petitioner raises a jurisdictional issue, can demonstrate 'cause and prejudice,' or in extraordinary circumstances, when the petitioner can demonstrate that a 'manifest injustice' would result unless habeas relief is granted." *Id*. (citing *Nixon*, 63 S.W.3d at 215; *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993)). The argument that newly

4

discovered evidence establishes a defendant's actual innocence is a habeas theory that "turns on [] application of the manifest injustice standard" for habeas relief. *Id*.

Relator's petition for a writ of habeas corpus alleges: (1) a freestanding claim of actual innocence; (2) a claim of actual innocence as a gateway to permit review of procedurally barred claims[3] that Relator was denied a constitutionally adequate trial; and (3) a claim of cause and prejudice as a gateway to permit review of procedurally barred claims that Relator was denied a constitutionally adequate trial.

Generally speaking, both a freestanding claim of actual innocence and a gateway claim of actual innocence seek habeas relief based on newly discovered evidence of innocence. Though the claims have this feature in common, they are otherwise materially distinguishable.

A freestanding claim of actual innocence presumes that a petitioner received a constitutionally adequate trial, but argues that it would nonetheless be manifestly unjust to continue to restrain the petitioner because newly discovered evidence clearly and convincingly shows "actual innocence that undermines confidence in the correctness of the [trial] judgment." *Id*. at 547-48. The newly discovered evidence supporting a freestanding claim of actual innocence must be of a nature that "no credible evidence remains from . . . trial to support the conviction." *Id*. at 548.

In contrast, a gateway claim of actual innocence argues that a petitioner did *not* receive a constitutionally adequate trial, and that it would be manifestly unjust not to review

---

[3]Procedurally barred claims are "claims that could have been raised at an earlier stage," as on direct appeal or in a timely filed post-conviction motion pursuant to Rule 24.035 or Rule 29.15. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 546 (Mo. banc 2003).

procedurally barred claims to that effect, where newly discovered evidence demonstrates actual innocence by a preponderance of the evidence. *Id.* at 546; *see Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000) (holding that habeas relief is available where a petitioner can show "manifest injustice or miscarriage of justice" by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). The new evidence supporting a gateway claim of actual innocence need not negate all of the evidence admitted at trial which supports the conviction, but must permit the conclusion when considered with all available evidence that "it is more likely than not that no reasonable juror would have convicted" the defendant. *Schlup*, 513 U.S. at 332 (O'Connor, J., concurring).

The gateway of cause and prejudice requires a petitioner to establish that his failure to timely raise a claim on direct appeal or in a post-conviction motion was caused by "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Nixon*, 63 S.W.3d at 215 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To establish the 'prejudice' necessary to overcome procedural default, a petitioner . . . bears the burden of showing, not merely that errors at his trial created possibility of prejudice, but that they 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 215-16 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Neither the gateway of actual innocence nor the gateway of cause and prejudice entitle a petitioner to habeas relief, standing alone. Rather, "gateway" habeas claims at best entitle a petitioner "to review on the merits of the [petitioner's] otherwise defaulted

6

constitutional claim[s]." *Amrine*, 102 S.W.3d at 546. Conversely, without proof of a gateway permitting habeas review of procedurally barred claims, "even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice" supporting habeas relief. *Clay*, 37 S.W.3d at 217 (quoting *Schlup*, 513 U.S. at 315-16 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993))).

***Relator's Gateway and Procedurally Barred Claims of Constitutional Error***

We first address the procedurally barred claims of constitutional error Relator asks us to review through the gateways of actual innocence or cause and prejudice.

Relator argues that he was deprived of a constitutionally adequate trial because: (1) the admission of discredited "pseudo-science" expert hair analysis during Relator's trial violated Relator's due process rights; (2) the State committed a *Brady*[4] violation by failing to disclose exculpatory evidence, specifically Division of Family Services ("DFS") records that revealed that M.D., the State's principal witness, was extensively coached before trial, and was uncertain in her eyewitness identification of Relator; and (3) Relator received ineffective assistance of counsel because trial counsel did not exploit the fragility of M.D.'s eyewitness identification of Relator, or adequately investigate evidence (the DFS records) that would tend to impeach M.D.'s eyewitness identification.

Following an exhaustive review of the habeas record, we conclude that Relator would be unable to sustain his burden to establish any of his procedurally barred claims,

---

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

7

even presuming Relator could establish a gateway allowing a court to review the untimely claims.

First, Relator claims he was convicted based on discredited pseudo-science in violation of his right to due process. The evidence which supported Relator's conviction was limited to two categories: expert witness testimony that a hair found at the crime scene "matched" Relator's hair, and M.D.'s trial testimony identifying Relator as the assailant who murdered M.D.'s mother and assaulted M.D. and her younger sister. *See Lincoln*, 457 S.W.3d at 801, 808. Several years after Relator's convictions, DNA testing established that the hair about which the expert witness testified at trial did not belong to Relator. *Id*. at 803-04. Notwithstanding the discredited "hair match" testimony, the Eastern District concluded that Relator was not entitled to release pursuant to section 547.037 because:

> While the post-conviction DNA testing excluded [Relator] as the source of the pubic hair found on the blanket at the crime scene, the hair evidence was not the "determinative factor" or "pivotal" to the State's case, and the State did not "assertively and repetitively" use that discredited evidence as affirmative proof of [Relator's] guilt. As the motion court found, M.D.'s testimony was the key.

*Id*. at 808. Because the jury convicted Relator based primarily on M.D.'s testimony, and not on the now discredited expert witness testimony, Relator cannot establish that his conviction violated his due process right to a fair trial.[5] *See McKim v. Cassady*, 457 S.W.3d 831, 848-52 (Mo. App. W.D. 2015) (denying habeas relief despite new scientific evidence

---

[5]To be clear, the results of the DNA testing, and the evolution of science and technology discrediting "hair match" testimony, could be considered, along with M.D.'s recantation, in determining whether Relator has met his present burden to establish either the gateway of actual innocence, or a freestanding claim of actual innocence. That, however, is a different inquiry from whether Relator received a constitutionally sufficient trial.

8

about cause of death where balance of the evidence heard by jury meant that relator could not establish that no reasonable juror would have convicted him).

Second, Relator argues that the fairness of his trial was infected by *Brady* violations. Relator complains that various DFS records (Exhibit 9 to Relator's habeas petition) were not provided to him before trial, and that these records reflect numerous clinical interviews of, and role-playing sessions with, M.D. which demonstrate that M.D. was extensively coached and uncertain in her eyewitness identification. "To prevail in his *Brady* claims, [Relator] must satisfy three components: (1) The evidence at issue must be favorable to him, either because it is exculpatory or because it is impeaching of an adverse witness; (2) that evidence must have been suppressed by the State, whether willfully or inadvertently; and (3) he must have been prejudiced." *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 338 (Mo. banc 2013). Here, the DFS records satisfy the first prong of the *Brady* test, as they include information that could have been used to impeach M.D. The second and third prongs are contested, however, as the State argues that it was not obligated to produce the DFS records, and that in any event, Relator was not prejudiced. We need not address the second prong of the *Brady* test as we agree with the State that the third prong cannot be established.

> To demonstrate *Brady* prejudice:
>
> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted)).

The DFS records supplemented information already known to Relator--namely that M.D.'s original accounts to the authorities had identified the assailant as a man by the name of "Bill," and had provided information about "Bill" that did not implicate Relator. The trial transcript reflects that M.D. was extensively cross-examined about her eyewitness identification of Relator, and impeached by questions that highlighted M.D.'s initial identification of her assailant as "Bill," with attributes Relator did not satisfy. Despite aggressive cross-examination, M.D. remained steadfast in her identification of Relator as the assailant. Though the DFS records would have provided Relator with even more ammunition to support the line of questioning in fact undertaken at trial, we are not persuaded that Relator did not receive a fair trial in the absence of this supplemental impeachment material. The absent records do not undermine our confidence in Relator's conviction because they cumulate with other, substantial evidence available to Relator on the same subjects raised by the records. This case is thus to be distinguished from habeas cases where suppressed evidence revealed a previously unknown basis to impeach a key, material witness under circumstances where the defendant's trial strategy was likely implicated. *See, e.g.*, *Ferguson v. Dormire*, 413 S.W.3d 40, 62-64 (Mo. App. W.D. 2013) (holding that *Brady* prejudice was established where an undisclosed interview with wife of key eyewitness identification witness would have provided a basis to impeach the witness not otherwise available to defendant); *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 252 (Mo. App. W.D. 2011) (holding that *Brady* prejudice was established where all

10

evidence of reports of domestic violence by victim's estranged husband had been suppressed by the State).

As an aside, it is noteworthy that Relator claims that the DFS records were made available to Relator "by the St. Louis Circuit Attorney through discovery during the litigation of [Relator's] DNA motion." [Habeas petition, p. 78] The DNA motion was litigated in 2005, ten years before Relator filed his first habeas petition in Cole County claiming a *Brady* violation. The significant passage of time between Relator's acquisition of the DFS records and his first assertion of a *Brady* violation strongly militate against Relator's current assertion that the records were prejudicially suppressed.

Third, Relator alleges that trial counsel was ineffective because he failed to exploit the fragility of M.D.'s eyewitness identification and failed to investigate the DFS records. As noted, our review of the trial transcript reveals that M.D. was thoroughly cross-examined by Relator's trial counsel on the very matters cumulatively supported by the DFS records. Relator has not persuasively demonstrated that he was prejudiced by trial counsel's alleged failure to further exploit or investigate the fragility of M.D.'s eyewitness testimony with the DFS records. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (requiring proof that trial counsel failed to exercise customary skill and diligence of a reasonably competent attorney, and that the failure prejudiced a defendant, in order to establish ineffective assistance of counsel).

Because Relator would be unable to sustain his burden to establish any of the procedurally barred claims asserted in the habeas petition, we need not further address whether Relator has established the gateway of actual innocence or of cause and prejudice.

11

Relator's habeas claims that depend for their review on establishing either gateway are denied.

### *Relator's Freestanding Claim of Actual Innocence*

All that remains of the habeas petition is Relator's freestanding claim of actual innocence. As noted, habeas relief requires a petitioner to establish that his continued restraint violates "the constitution or laws of the state or federal government." *Amrine*, 102 S.W.3d at 545. A freestanding claim of actual innocence presumes that a petitioner received a constitutionally adequate trial. *Id*. at 547. Thus, for a freestanding claim of actual innocence to support habeas relief, a petitioner must establish that his continued restraint is manifestly unjust because it violates the constitution or laws of the state or federal government, notwithstanding that the petitioner in fact received a fair trial.

A freestanding claim of actual innocence was first recognized by the Missouri Supreme Court in *Amrine*. Since *Amrine*, however, no reported appellate opinion in this State has relied on a freestanding claim of actual innocence to afford habeas relief.[6] The current parameters of a cognizable claim remain controlled by *Amrine*.

In *Amrine*, three witnesses whose trial testimony led to Amrine's conviction, and to the imposition of a sentence of death, subsequently recanted their trial testimony. *Id*. at 548. As a result of the recanted trial testimony, Amrine's case "present[ed] the rare circumstance in which no credible evidence remain[ed] from the first trial to support the conviction." *Id*. In his habeas petition, Amrine did not claim that his trial was

---

[6]In *State ex rel. Clemons v. Larkins*, 475 S.W.3d 60, 93-97 (Mo. banc 2015), the Supreme Court analyzed Clemons's freestanding claim of actual innocence, but rejected the claim. *Clemons*, like *Amrine*, was a death penalty case.

constitutionally inadequate, but instead claimed a freestanding claim of actual innocence. Specifically, Amrine claimed that his continued restraint in the face of new evidence of actual innocence--the recanted testimony--was manifestly unjust. *Id*. at 545.

To resolve Amrine's claim, the Missouri Supreme Court was required to address whether it would recognize a freestanding claim of actual innocence as a basis for affording habeas relief, and if so, the required burden of proof to establish the claim. *Id*. With respect to both points, the Supreme Court concluded:

> Because the continued imprisonment *and eventual execution* of an innocent person is a manifest injustice, a habeas petitioner *under a sentence of death* may obtain relief from a judgment of conviction *and sentence of death* upon a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment.

*Id*. at 543 (emphasis added). The Supreme Court's holding, plainly read, recognized a freestanding claim of actual innocence in cases where the death penalty has been imposed because the prospect of executing an innocent person, in the face of clear and convincing evidence of innocence, is a manifest injustice.[7] The Court's rationale for reaching this conclusion is instructive and controlling:

> In *Herrera v. Collins*, 506 U.S. 390 (1993), the United States Supreme Court discussed the viability of a freestanding claim of actual innocence as a basis for habeas relief in the federal courts. Although the Court determined that federalism concerns militated against recognizing actual innocence as a basis for federal habeas relief, the Court assumed for the sake of argument that:
>
>> in a capital case a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim.

---

[7]We have previously expressed that *Amrine*'s recognition of the freestanding claim of actual innocence as a basis for habeas relief may be limited to cases where the death penalty has been imposed. *See, e.g.*, *McKim*, 457 S.W.3d at 847 n.27; *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 230 n.9 (Mo. App. W.D. 2011).

13

*Id*. at 417.  In other words, as *Herrera* recognized, even if a federal court were found not to have jurisdiction to review a state conviction and sentence in the absence of a federal constitutional issue, this would not deprive a state court from reviewing the conviction and sentence if its own state habeas law so permitted.  The issue now before this Court, then, is whether, in the words of *Herrera*, Missouri has left a "state avenue open to process such a claim." *Id*.  This Court finds that it has done so.

Having recognized the prospect of an intolerable wrong, the state has provided a remedy.  As noted, it is not the remedy set out in *Clay* [*v. Dormire*], for, while the *Clay* standard is appropriate for cases involving procedurally defaulted constitutional claims, it fails to account for those rare situations, such as Amrine's, in which a petitioner sets forth a compelling case of actual innocence independent of any constitutional violation at trial. This is all the more true here, where the execution of a potentially innocent man is at stake, for ***the death penalty is fundamentally different from other cases in which innocence is asserted after a fair trial***.  For this reason, ***uniquely under Missouri's death penalty statute***, section 565.035.3, this Court is charged with determining not merely the sufficiency but also the "strength of the evidence."  *See State v. Chaney*, 967 S.W.2d 47 (Mo. banc 1998).  The obvious purpose is to avoid wrongful convictions and executions. The ***duty to do so in death penalty cases*** is, just as obviously, a continuing one.  It is difficult to imagine a more manifestly unjust and unconstitutional result than permitting the execution of an innocent person.  Therefore, it is incumbent upon the courts of this state to provide judicial recourse to an individual who, after the time for appeals has passed, is able to produce sufficient evidence of innocence to undermine the habeas court's confidence in the underlying judgment that resulted in defendant's conviction ***and sentence of death***.  The writ of habeas corpus is the appropriate means for Amrine to assert this claim.

*Id*. at 546-47 (emphasis added).

The Supreme Court thus crafted its recognition of a freestanding claim of actual innocence around the narrow prospect that it would be a violation of the Court's duties pursuant to section 565.035.3, and thus, a manifest injustice, to refuse habeas relief where newly discovered evidence of actual innocence in a death penalty case undermines confidence in the conviction, notwithstanding a constitutionally adequate trial.  *Amrine*'s

14

rationale for recognizing a freestanding claim of actual innocence in such a circumstance is thus wholly consistent with its statement that habeas relief requires a demonstration that "the constitution or laws of the state or federal government" have been violated. *Id.* at 546.

*Amrine* cannot be read, therefore, to have broadly recognized a freestanding claim of actual innocence in non-death penalty cases. In fact, in a concurring opinion, Justice Wolff underscored that "death penalty cases are different. . . . For no other crime is an appellate court given [the statutory] power" to assess the strength of the evidence to uphold an otherwise final conviction. *Id*. at 549 (Wolff, J., concurring). Though Justice Wolff also stated that "relief by habeas based on actual innocence and manifest injustice is not limited to death penalty cases," he cited only to the example of post-conviction DNA testing and possible release described in sections 547.035 and 547.037, a *statutory* right that exists independent of habeas jurisprudence. *Id*. In fact, Justice Wolff's concurrence observed that "[t]he law usually does not condone recantations; they are not normally recognized to overturn a lawful conviction and sentence." *Id*. (citing *State v. Harris*, 428 S.W.2d 497, 502 (Mo. 1968)).

Moreover, *Amrine* cannot be read to have broadly recognized a freestanding claim of actual innocence grounded in the constitutional principle of due process. In fact, *Amrine* expressly declined to determine whether the continued incarceration and eventual execution of a person who clearly and convincingly establishes actual innocence violates the due process clause of the constitution, resulting in a manifest injustice warranting habeas relief. *Id*. at 546 n.3. The Supreme Court explained that because a violation of state law (section 565.035.3) yields a manifest injustice, it did not need to determine

15

whether it would simultaneously violate the Missouri constitution to incarcerate and eventually execute an individual who is actually innocent. *Id.* It thus remains an open and unanswered question whether *either* the continued incarceration *or* execution of a person who clearly and convincingly establishes his actual innocence after a constitutionally adequate trial violates due process, warranting habeas relief pursuant to a freestanding claim of actual innocence.[8]

Relator's habeas petition presumes that a freestanding claim of actual innocence has been broadly recognized in Missouri as a basis for habeas relief in all cases. Though Relator acknowledges this court's previously expressed reservation that *Amrine* appears limited to death penalty cases,[9] Relator concludes, without analysis, that "nothing in Missouri law suggests such a dichotomy on the question of innocence." [Habeas petition, p. 55 n.23] To the contrary, as we have explained, a plain reading of *Amrine* permits no other conclusion than that such a dichotomy does exist in Missouri's habeas jurisprudence.

Relator also mistakenly presumes that if his new evidence clearly and convincingly establishes actual innocence, that alone is sufficient to establish a manifest injustice. *Amrine* clearly discredits this proposition, holding that habeas relief requires a

---

[8]*Amrine* does cite favorably to cases from other jurisdictions where a freestanding claim of actual innocence as a basis for state habeas relief has been recognized in both death penalty and non-death penalty cases because continued incarceration or execution would violate principles of due process. 102 S.W.3d at 547 n.4 (citing *People v. Washington*, 665 N.E.2d 1330, 1336-37 (Ill. 1996) (not a death penalty case); *State ex rel. Holmes v. Court of Appeals*, 885 S.W.2d 389, 397-98 (Tex.Crim.App. 1994) (a death penalty case, the application of which was expanded on due process grounds to non-death penalty cases in *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex.Crim.App. 1996)); *Summerville v. Warden, State Prison*, 641 A.2d 1356, 1369 (Conn. 1994) (no discussion limiting holding to death penalty cases); *In re Lindley*, 177 P.2d 918 (Cal. 1947) (death penalty case)). However, *Amrine*'s citation to these cases was for the limited purpose of supporting the conclusion that a "writ of habeas corpus is [an] appropriate means" to raise a freestanding claim of actual innocence. 102 S.W.3d at 547.
[9]*See supra* note 7.

demonstration that "the constitution or laws of the state or federal government" have been violated. *Id.* at 545. Relator does not argue that any state or federal statute has been violated by his continued incarceration in the face of what he argues to be compelling evidence of actual innocence, and relies solely on a loosely alleged violation of the due process clause of the constitution.[10] We have just explained that our Supreme Court has yet to recognize a claim that the due process clause is implicated by either continued incarceration or eventual execution when new evidence of actual innocence undermines confidence in a conviction obtained after a constitutionally adequate trial. *Id*. at 546 n.3.

In short, no matter how compelling Relator's argument may be, we are constrained to afford habeas relief only as authorized. "Even though the interests protected by the writ are fundamental, relief is limited in order to avoid unending challenges to final judgments." *Id*. at 546.

Until the Supreme Court announces that a freestanding claim of actual innocence is a recognized basis for securing habeas relief because *either* the continued incarceration *or* eventual execution of an actually innocent person violates principles of due process, we have no authority to presume that Missouri's habeas jurisprudence permits such a claim in a non-death penalty case.[11]

---

[10]The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides in pertinent part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Article I, section 10 of the Missouri constitution similarly provides that "no person shall be deprived of life, liberty or property without due process of law."

[11]In *State ex rel. Woodworth v. Denney*, the Supreme Court observed that Woodworth had asserted a freestanding claim of actual innocence in addition to *Brady* claims in his habeas petition. The Supreme Court generally acknowledged that "a freestanding claim of actual innocence, if shown by [] clear and convincing evidence, provides grounds for habeas relief without the need to prove any constitutional violation at trial." 396 S.W.3d 330, 337 n.5 (Mo. banc 2013) (citing *Amrine*, 102 S.W.3d 541). However, because the master in that case "did not reach the claim of actual innocence, as he found cause and prejudice based on the *Brady* claims and had

17

We thus deny Relator's freestanding claim of actual innocence.

## Conclusion

Relator's petition for writ of habeas corpus relief is denied.[12]

_Cynthia L. Martin_
_____
Cynthia L. Martin, Judge

All concur

---

considered the newly discovered evidence in regard to the prejudice prong of that claim," the Supreme Court similarly declined to address Woodworth's freestanding claim of actual innocence. _Id_. _Woodworth_ was not a death penalty case. However, the Supreme Court's mere acknowledgement of Woodworth's assertion of a freestanding claim of actual innocence cannot be fairly read as an implicit expansion of its holding in _Amrine_.

[12]_See_ Rule 84.24(n) (providing that if an appellate "court disposes of a petition for a writ by the issuance of an opinion, further review of the action shall be allowed only as provided in Rule 83 and Rule 84.17").

In addition, nothing prevents Relator from seeking clemency. "History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." _Herrera v. Collins_, 506 U.S. 390, 417 (1993).