

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| RODNEY LEE LINCOLN, | ) | No. ED100987 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | |
| STATE OF MISSOURI, | ) | Hon. Robin R. Vannoy |
| | ) | |
| Respondent. | ) | FILED: December 2, 2104 |

Rodney Lee Lincoln ("Movant") appeals from the judgment of the motion court that denied his Amended Motion for Release pursuant to section 547.037 RSMo (Cum. Supp. 2004).[1] Movant contends that the motion court clearly erred denying his Amended Motion for Release because DNA testing proved that the expert hair comparison evidence was false, and that he is more likely than not to be innocent, such that no rational finder of fact could fairly find him guilty beyond a reasonable doubt of the crimes. Movant also argues that the State of Missouri should be estopped from pursuing a new theory of the crime that is factually inconsistent with the State's theory of the case. The State responds that the lack of a DNA hair match did not demonstrate Movant's innocence by a preponderance of the evidence, and that it was the eyewitness identification and testimony by one of the victims that was the crux of Movant's convictions. Finding no error, we affirm.

---

[1] All further statutory citations are to RSMo (Cum. Supp. 2004) unless noted otherwise.

On April 27, 1982, Joanne Tate and her two daughters were at home in a first-floor apartment in a multi-family flat.[2]  At approximately 4:00 a.m., an upstairs neighbor heard a loud noise from Tate's apartment.  Around 10:00 a.m., Tate's brother and her boyfriend entered the apartment and found her dead, lying face down in a pool of blood.  Tate's two daughters, M.D. and R.T., were lying in a bed, covered in blood, both with multiple stab wounds.

M.D. and R.T. were interviewed by the police, and a composite drawing was made and released to the media.  Movant was identified by two of Tate's relatives, and M.D., then age 7, identified a photograph of Movant in a photo display.  She later identified Movant as her attacker in a four-person lineup at the police station.  At trial she testified that on the night of the murder, she woke up when she heard a scream, and she saw her mother laying down on her stomach in a pool of blood near the door to her bedroom.  She stated that she saw a naked man, who came over to her bed, picked her up, and carried her to Tate's bedroom, put her on the bed and removed her clothes.  She said he tried to get her "to do a few things."  He began to hurt her by stabbing her repeatedly, and she tried to play dead until he stopped.  She testified that he washed off the knife, and she hid under R.T.'s bed.  She heard him hurt her sister.  She stated that she got a good look at the killer when she was in Tate's bedroom.  M.D. said that she did not recall his name at that time, but she remembered seeing him prior to that night, and a long time ago, Tate, M.D., and R.T. spent the night at Movant's house, which was across from a park with a playground.  She said that Movant's mother and some pets lived at his house.  She identified the playground at the park from photos.

---

[2] The statement of facts regarding the crime prior to the events of the trial are derived from the statement of facts set forth in the direct appeal following Movant's convictions in State v. Lincoln, 705 S.W.2d 576, 577-578 (Mo. App. 1986).  Movant also filed a motion for post-conviction relief pursuant to Rule 27.26 that was denied by this Court in Lincoln v. State, 755 S.W.2d 706 (Mo. App. 1988).

M.D. examined photos of Tate's boyfriend and of R.T.'s father, and stated that neither was the man who hurt her. She examined other photos and stated that none of them were the killer. She identified a photo of Movant as the man who hurt her, R.T., and Tate. She recalled identifying Movant in a police lineup and verified that identification using a photo of the police lineup. She identified Movant in the courtroom as the man who hurt her, Tate, and R.T. She explained why she initially told people questioning her that "Bill did it[,]" which was that she was sick and hurt and everyone kept bothering her for a name, so she said "Bill." She stated several times that "Bill" and Movant were the same person, and that at the time of the attacks, she did not really know Movant's name.

Two criminalists employed by the City of St. Louis Police Department, Joseph Crow and Harold Messler, testified at Movant's trial about hair found at Tate's house. Crow testified that he examined a blanket found in Tate's bedroom for hairs, excluded a number of them, and found one sample of a pubic hair that did not belong to Tate. On cross-examination Crow stated that the information that can be gathered from a hair is limited; that he did not think that it was possible to determine the age of the person, that one could not identify the ethnicity of a hair from a Caucasian "with a great deal of certainty." He passed this hair sample, Exhibit 22a, to Messler for further examination. Messler testified that he compared Exhibit 22a to a sample from Movant, along with pubic hair samples from 37 other apparently Caucasian people. The thirty-seven other samples were not comparable to Exhibit 22a. Messler testified about the limits of hair comparison. He stated that he could generally tell Caucasian from Oriental or Negroid, but that he could not tell age, sex, "or just about anything else." On cross-examination, Messler stated that there was no way to determine how long a hair had been removed from the human body, i.e., the hair does not deteriorate with age.

Messler was recalled to testify further on redirect. He stated that he compared Exhibit 22a to pubic hairs from 39 people: Tate, Movant, and 37 others, and only Movant's "matched[,]" and that in two hundred cases that he has handled, he had never found one where a hair recovered from the crime scene matched to more than one person.

The State did not raise the hair sample in the initial part of its closing argument. It stressed M.D.'s testimony, noting that R.T. was too young to testify, and stating that M.D. "bore the responsibility for the three of them [Tate, R.T., and herself] to tell you what happened that night." The State recapped M.D.'s testimony, and how the physical evidence corroborated what she said. Regarding her identification of the killer at first as "Bill," the State reiterated her statement that she was hurt and gave a name to stop the questioning. It pointed out how M.D. excluded suspects based on their photos, and described the killer as someone who looked a bit like someone in her neighborhood named "Dennis" though she said that "Dennis" was not the actual killer.[3] It emphasized how M.D. told the police that the killer lived across the street from a park, like Movant did, and how she identified a photo of Movant as the killer.

Defense counsel repeatedly attacked M.D.'s credibility and inconsistencies in her statements in its closing argument. Defense counsel's attack on the evidentiary value of the hair sample was brief in comparison to his attacks on M.D.

Defense counsel noted that most of the samples used by Messler for comparisons were taken from people who had not been in Tate's house, despite the large number of people in the investigation that came and went there and were not checked. Defense counsel pointed out that there was no way to determine how long the hair sample had been in the house, and that "[y]ou can't tell anything except that it might have come from [Movant]." Counsel observed that many

_____

[3] The police took a photo of Dennis, and using that photo as a basis along with M.D.'s input and description, made a composite image of the suspect. Tate's brother and sister recognized the man in the composite drawing, and eventually recalled that the man's name was "Rod."

4

people have dark hair. Counsel commented on Crow knocking hairs off the blanket with a stick, looking at them, and throwing fifty of them away. Counsel argued that the State wanted the jury to presume that the hair that might have been Movant's was in fact the hair of the killer, and that the State never proved it.

Defense counsel returned to attacking M.D.'s credibility later in the closing argument, pointing out "[w]hat on earth is there to corroborate the testimony of the child[,]" and asserting that he did not think that M.D. saw the killer, or identified anyone because it was dark in the house at the time of the murder and assaults. Defense counsel again hammered at what it saw as inconsistencies in M.D.'s story. Counsel returned to the subject of the hair sample in reviewing the testimony of Messler and Crow, noting that Messler stated that there was no way to know how long a hair has been somewhere because it does not deteriorate, and Crow said that you cannot ever say that that a hair came from a particular person, which left the jury with "a child who is most inconsistent." Counsel closed out the argument by telling the jury not to make excuses for inconsistencies in M.D.'s testimony that they would not accept from an adult.

The bulk of the State's rebuttal argument was focused on M.D.'s credibility. The State only addressed the hair evidence briefly, arguing that defense counsel was mischaracterizing that evidence.

The jury convicted Movant on two counts of first-degree assault and on the lesser-included offense of manslaughter under the murder count. Movant was sentenced as a persistent offender to a term of fifteen years' imprisonment on the manslaughter count and to life imprisonment on each assault count, with each term to run consecutive to the others. Movant's convictions and sentences were upheld on direct appeal in State v. Lincoln, 705 S.W.2d 576

(Mo. App. 1986). Movant's motion for post-conviction relief pursuant to Rule 27.26 was denied by this Court in Lincoln v. State, 755 S.W.2d 706 (Mo. App. 1988).

Movant filed a motion for DNA testing pursuant to section 547.035 on March 3, 2005, and filed a third amended motion for post-conviction DNA testing on April 24, 2012. The parties stipulated sending materials for DNA testing. Movant thereafter filed an amended motion for release pursuant to section 547.037. The parties stipulated as to the results of the DNA testing.

The motion court made findings of fact and conclusions of law. It found, among other things, that the issue of the credibility or reliability of M.D.'s testimony to be relevant or persuasive as to Movant's motion for release. It also found that for purposes of the motion for release, only two other items were relevant: the pubic hair found on the blanket, and a pubic hair found on R.T.'s perineum, as the parties agreed that the various police reports gave no results that could place Movant at the scene of the crime. The motion court found that the hair comparison testimony of Crow and Messler was not the "lynchpin" of Movant's conviction, but rather that the testimony of M.D. was. It found that,

> The child's testimony never wavered that it was in fact movant/defendant who attacked the family. The hair comparison testimony therefore was not the only evidence that the State had, and determining what was or was not the lynchpin would require the court to read the minds of the jurors, and it cannot be decided after a review of the transcript 30 years later.

Regarding the hair on the blanket, the motion court noted that DNA testing showed that it did not belong to Movant, but found that this lack of a DNA match did not exonerate Movant, given that there was no knowledge about the blanket available: where it came from, how long it had been in the house, or who had contact with it outside of the date of the murder. It found that while Movant was not the source of the pubic hair on the blanket, this did not show that he was not in

6

the house at the time of the crime and was not perpetrator of the crimes. Concerning the hair found on R.T.'s perineum, the motion court noted that this evidence was not used at trial, as Messler had noted in his lab report that it was comparable to the head hair of R.T., and Movant was excluded as the source of the hair. The motion court further noted that while the trial testimony suggested that M.D. and R.T. had been assaulted sexually, no allegations of a sexual nature were filed. The motion court found that there was no evidence how long this hair had been there, and that the lack of the identity of the source of the hair did not prove Movant's innocence. It found that while the source of that hair and how it ended up on R.T.'s perineum will never be known, that fact would not and does not exonerate Movant.

The motion court found that Movant failed to show by a preponderance of the evidence that the DNA results prove his innocence, and denied his amended motion for release. Movant now appeals from this judgment.

We review Movant's amended post-conviction motion for release as we would for other civil post-conviction motions. See section 547.037.6; Bey v. State, 272 S.W.3d 378, 382 (Mo. App. 2008). We will affirm the motion court's judgment unless its findings of fact and conclusions of law are clearly erroneous. Id. Findings and conclusions are clearly erroneous only if, after a review of the entire record, we have the definite impression that a mistake has been made. Id.

In his first point relied on Movant contends that the motion court clearly erred in denying his motion for release pursuant to section 547.037 because the post-conviction DNA results "prove that the microscopic hair comparison evidence used by the State to establish [Movant]'s identity as the perpetrator of these crimes and to corroborate the unreliable identification of [Movant] by a seven-year old girl are false and that [Movant] is more likely than not innocent

7

such that no rational fact finder, based upon all of the evidence, could now fairly find Appellant guilty beyond a reasonable doubt in violation of Due Process of Law" as guaranteed by the U.S. Constitution, the Missouri Constitution, and section 547.032.

Section 547.037.4 provides, in part, that the movant has the burden of proving the allegations of his or her motion for release "by a preponderance of the evidence." See Bey, 272 S.W.3d at 382-83. Section 547.037.5 provides that if the DNA testing ordered pursuant to section 547.035 "demonstrates the movant's innocence of the crime for which he or she is in custody, the court shall order the movant's release[,]" but if not, relief is to be denied. See Bey. 272 S.W.3d at 383.

To meet the preponderance of evidence standard, a party bears the burden of proving that the act to be proved is more likely true than not. Horning v. White, 314 S.W.3d 381m 385 (Mo. App. 2010). In determining if a party has met this standard, the finder of fact has to resolve conflicting evidence and decide which position is more probable, more credible, and has greater weight. Spencer v. Zobrist, 323 S.W.3d 391, 399 (Mo. App. 2010) (quoting Fujita v. Jeffries, 714 S.W.2d 202, 206 (Mo. App. 1986)).

Movant attempts to argue that the motion court applied "a more exacting standard" of "innocence" than required by the statute because the motion court twice used the word "exonerate" in discussing the hair evidence to the effect that the lack of a DNA match of the hairs did not exonerate Movant. Movant asserts that this reflects a misperception by the motion court that "innocence" under section 547.037 "requires a showing that DNA evidence must establish innocence to an absolute certainty[,]" which is an impossible standard not recognized by any court. Movant is engaging in semantics and placing an interpretation on the motion court's choice of words that was not intended, as is evident by reading the entire judgment.

8

Movant is correct in his statement that the DNA evidence established that he was not the source of the pubic hair found on the blanket or the hair found on R.T.'s perineum, and that this discredits the testimony of Crow and Messler about the hair. However, he is incorrect in his assessment of the impact of both the hair evidence at trial and the effect of the DNA testing on his convictions. Movant relies on two cases from Wisconsin that it contends support his motion for release, State v. Hicks. 549 N.W.2d 435 (Wis. 1996) and State v. Armstrong, 700 N.W.2d 98 (Wis. 2005). Those cases are not of precedential value in Missouri, and moreover are inapposite. In both cases the respective defendants were seeking a new trial based on DNA evidence rather than a release from incarceration, which is the situation in the present case. In addition, the Wisconsin Supreme Court placed great emphasis on the State of Wisconsin's heavy reliance on the use of discredited hair evidence as proof of the defendants' guilt in those cases, noting the prosecution "assertively and repetitively" used that physical evidence as "affirmative proof" of guilt, and held that it was crucial to the state's cases.

The present case is not similar to Hicks and Armstrong. We note initially that Movant is not requesting a new trial, but rather release from incarceration. More significantly, Movant's convictions in the present case were not based on the State "assertively and repetitively" using the pubic hair as "affirmative proof" of guilt. In his opening statement, the prosecutor focused on M.D.'s testimony, and only mentioned the hair evidence at the end of his statement. Far from using the physical evidence as affirmative proof of Movant's guilt, the State said that its expert, Messler would be able to testify merely that the pubic hair "*could have* come from [Movant]." (Emphasis added). In other words, Movant could not be excluded as a suspect based on Messler's analysis. The State also said that Messler would testify that matches between a pubic hair found at a crime scene and the general public were uncommon, perhaps one in a hundred. In

9

other words, the State was asserting the hair evidence would show that Movant was a viable suspect, and it did not state that such evidence was proof positive that Movant was the killer. During the trial, the State emphasized M.D.'s testimony and identification of Movant as her assailant. The State did not "assertively and repetitively" use the pubic hair evidence as affirmative evidence of Movant's guilt. Messler testified that Movant's pubic hair was a "match" for the hair found on the blanket, and that the other samples he compared to Exhibit 22a did not match. Both Messler and Crow testified about the severe limits of hair analysis, namely that one could tell, generally, whether a pubic hair came from a person of Caucasian, Negroid, or Oriental origin, but not age, gender, ethnicity, or how long it had been present at a location because the hair did not deteriorate. Defense counsel cross-examined Messler and Crow on the limits of such evidence. In the initial part of its closing argument, the State did not even mention the pubic hair evidence, but rather focused on M.D.'s testimony and identifications of Movant. It was Movant's defense counsel that raised the hair evidence in closing argument, and then only after extensively attacking the reliability and credibility of M.D., which attack he returned to after a brief attack on the pubic hair evidence in which defense counsel pointed out that the State did not prove that the hair came from Movant, noting that Crow said that a hair could not be identified as belonging to one particular person, much less prove that the hair belonged to Tate's killer. The State briefly rebutted Movant's attack on the hair evidence, arguing that defense counsel was mischaracterizing the experts' testimony, noting that none of the other samples matched Exhibit 22a, and that Messler had never had more than one match to a particular hair in two hundred cases. However, the bulk of the State's rebuttal was devoted to M.D.'s credibility and reliability, not to the hair evidence.

The present case is more similar to that of <u>Wethington v. State</u>, 655 N.E.2d 91 (Ind. Ct. App. 1995). In that case an elderly woman was abducted in her car from a grocery store parking lot by the defendant, who drove off, struck her in the head with a tire tool, threatened to kill her, then took her out of the car, choked her, beat her head again with the tire tool, then drove off. <u>Id</u>. at 93-94. The victim identified the defendant as her attacker, and a hair found in her car was introduced into evidence. <u>Id</u>. at 94. The State's expert testified that the tests on the hair sample did not exclude the defendant and could have been his hair. <u>Id</u>. The defendant later requested DNA testing to prove that the hair found in the victim's car did not belong to him, arguing that the hair analysis evidence was "crucial" because the victim's identification of him was "weak" because her vision was affected when her glasses were knocked off and when the beating caused blood in her eyes, a detached retina, and optic nerve damage. <u>Id</u>. The defendant also criticized her initial description of him as inaccurate. <u>Id</u>. The Indiana Court of Appeals held that the proper standard of review on the defendant's motion for DNA testing was "a preponderance of the evidence." <u>Id</u>. It further held that the hair sample "was not pivotal evidence at trial[,]" noting that it had not been conclusively determined to be that of the defendant and that the state's expert testified that it could have come from the defendant, or that it could have come from someone else. <u>Id</u>. at 95. It noted that the trial court concluded that the "newly discovered evidence" would not likely lead to a different result on a retrial. <u>Id</u>. The Indiana Court of Appeals held that the defendant failed to show that such evidence "leads only to a contrary conclusion." <u>Id</u>.[4]

In the case at hand, the motion court found that M.D.'s testimony was the key to the convictions. Movant attacked her credibility and reliability at trial, much like the defendant in

---

[4] We note that the defendant in this case did not seek a release, but merely a re-trial, and the appellate court still held that he failed to meet his burden by a preponderance of the evidence.

11

Wethington. The State's experts testified that the pubic hair found on the blanket "matched" Movant's pubic hair sample, which included him as a source of the hair, but they also testified that they could not tell that the hair came from him, or from a woman, or someone older or younger, or how long it had been on the blanket.

Movant attempts to attack M.D.'s credibility in his brief by arguing that the "only other evidence identifying [Movant] as the killer came from the testimony of an eight year old girl." The trial court found that M.D. was competent to testify at Movant's trial despite her young age, and this Court affirmed that finding in State v. Lincoln, 705 S.W.2d 576, 578 (Mo. App. 1986). Sections 547.035 and 547.037 do not give Movant the ability to attack M.D.'s credibility from the trial. Bey, 272 S.W.3d at 384. Rather, those statutes give Movant the chance to show his innocence by DNA testing. Id. Movant did not demonstrate his innocence by a preponderance of the evidence, and the motion court did not clearly err in denying his motion for release under section 547.037. Point denied.

In his second point relied on Movant asserts that the motion court clearly erred in finding that Exhibit 22a was not his hair and then failing to estop the State "from asserting a new theory to explain away the exonerating post-conviction DNA results." He avers that the "new theory" is factually inconsistent with the State's interpretation of the evidence before the jury at trial, violating the requirements of due process of law as guaranteed by the U.S. Constitution and the Missouri Constitution.

Movant alleges that the State is asserting a theory that is "completely inconsistent with the theory it used to convict [him] of these crimes at trial[,]" and should be estopped from downplaying the significance it made of the hair during the trial "or reinterpreting the hair evidence in a manner that contradicts the interpretation it presented to the jury." We note

12

initially that the cases relied on by Movant are inapposite. In <u>Smith v. Groose</u>, 205 F.3d 1045 (8th Cir. 2000), the State had multiple trials against multiple defendants for the same crimes, with the same prosecutor in each case, and argued different prosecutorial theories about when the victims were killed and who killed them to secure the maximum convictions for the maximum number of defendants. In essence, the State claimed that some evidence was true in one case and some evidence was false, and then reversed its position of those pieces of evidence in the trial of a different defendant for the same crimes. The 8th Circuit Court of Appeals held the use of such inherently factually contradictory theories can violate the principles of due process, and that it did so in that case. It held that the State's use of "diametrically opposed testimony" to obtain multiple murder convictions rendered the convictions infirm. Movant also cites to <u>State v. Carter</u>, 71 S.W.3d 267 (MO. App. 2002), which relies on <u>Groose</u>, for this proposition, in a case that also involved multiple trials of multiple defendants for the same crime and contradictory allegations about who cut someone's throat. We agree with these holdings about the potential due process considerations, but note that the present case involves a single defendant and a single trial, and not factually contradictory inconsistent theories. The State in the present case is not asserting that the pubic hair belonged to Movant to secure a conviction against him and then arguing that it belonged to someone else to secure a conviction against a different defendant. Rather, the State acknowledged that some of the evidence that it presented at Movant's trial later proved to be not inculpatory, and that if it had that information it would not have presented that evidence.[5] However, the State's theory of the crime and the facts remains the same, namely that Movant killed Tate and assaulted M.D. and R.T.. This is not inconsistent or contradictory.

---

[5] We note that the testimony of Crow and Messler at Movant's trial was not actually inconsistent with the later DNA evidence of the hair. Messler testified that it matched the sample from Movant based on a gross physical examination, not that it actually belonged to Movant. The DNA testing established that while Exhibit 22a might

13

Movant argues that courts in other jurisdictions have rejected the prosecution's attempts to "explain away" DNA evidence "by asserting theories that the respective juries never heard." We have already discussed the problems with Movant's reliance on Hicks and Armstrong, both of which involved a defendant seeking a new trial, not seeking to be released, and both involved situations in which the appellate courts held that the prosecution "assertively and repetitively" used physical evidence that was later discredited by DNA testing to "affirmatively prove" the guilt of the defendants. This is not the situation in Movant's case. Movant also cites to Commonwealth v. Reese, 663 A.2d 206 (Pa. Super. Ct. 1995). In that case, the defendant also sought a new trial rather than release, and is further distinguishable because the state put on evidence at the evidentiary hearing that was not presented to the jury at the original trial, and thus that jury could not consider. We find the situation in the present case to be more similar to that in Wethington, 655 N.E.2d at 94-95. Point denied.

We hold that the motion court did not clearly err in denying Movant's Motion for Release. While the post-conviction DNA testing excluded Movant as the source of the pubic hair found on the blanket at the crime scene, the hair evidence was not the "determinative factor" or "pivotal" to the State's case, and the State did not "assertively and repetitively" use that discredited evidence as affirmative proof of Movant's guilt. As the motion court found, M.D.'s testimony was the key. The post-conviction DNA testing did not establish Movant's innocence by a preponderance of the evidence. We hold further that the State did not assert a new theory to explain away the post-conviction DNA results that is inconsistent with its interpretation of the evidence at trial. The State's theory of the crime and facts are the same, to-wit, Movant killed Tate and assaulted her children.

look to be "consistent" with the sample from Movant and might be a "match" on that basis, it did not in fact belong to Movant.

The judgment of the motion court is affirmed.

_____
CLIFFORD H. AHRENS, Judge

Lawrence A. Mooney, P.J., concurs.
Glenn A. Norton, J., concurs.