

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

STATE OF MISSOURI,      )
     )
                Respondent,    )
     )    **WD81592**
v.      )
     )
     )    **OPINION FILED:**
     )    **August 20, 2019**
ANTHONY DIXON,      )
     )
                Appellant.    )

**Appeal from the Circuit Court of Johnson County, Missouri**
**The Honorable R. Michael Wagner, Judge**

**Before Division Four:** Karen King Mitchell, Chief Judge,
Anthony Rex Gabbert, Judge, and Timothy J. Flook, Special Judge

Anthony Dixon appeals, following an evidentiary hearing, the denial of his motion for release based on post-conviction DNA testing. Dixon claims that the motion court erred in (1) admitting testimony regarding similar criminal charges filed against him in another case; (2) discounting expert testimony regarding the reliability of witness identification; (3) failing to apply any standard of "innocence" under § 547.037; and (4) denying his motion because the DNA evidence proved, by a preponderance of the evidence, that he would not have been convicted had that evidence been admitted at his criminal trial. Finding no error, we affirm the motion court's denial of Dixon's motion for release.

## Background

A jury found Dixon guilty of forcible rape, forcible sodomy, and two counts each of first-degree robbery and armed criminal action, for which he was sentenced to a total of life plus sixty years in the Department of Corrections. This court affirmed his convictions and sentences on direct appeal and denied his request for post-conviction relief. *State v. Dixon*, 969 S.W.2d 252 (Mo. App. W.D. 1998). We summarized the facts of Dixon's case as follows.

> On August 4, 1993, [S.N.][1] was working the 11:00 p.m. to 7:00 a.m. shift for the night clerk at the Super 8 Motel in Harrisonville[, Missouri,] where she was employed as the manager. At approximately midnight, she was standing near the door of her apartment in the hotel, which was located down the hall from the front desk, when she noticed a man standing in the doorway with a gun. The man was wearing dark clothing, including a dark-hooded sweatshirt with the hood up, and he had a sock-type hat pulled down over his face. From the eye and mouth cut-outs in the hat, she could tell that the individual was a black man with a short-cropped moustache.

> The man aimed a gun at her and told her to get down on the carpet. He told her that he wanted to know where the money was. She responded that the motel did not have a safe.[2] The gunman then went to the office. After seeking her assistance, the man found the cash drawer and used the key to take out the money. He demanded more money, and [S.N.] finally told him that there was money in a different drawer. After retrieving the money, he returned and demanded more money.

> He then obtained a piece of clothesline rope from the bag he was carrying and tied [S.N.'s] hands behind her back.[3] He pressed his knees into her back, put the gun to her head and again demanded more money. He also went through the motel cards that indicated which rooms in the motel were occupied and asked [S.N.] about a master key.

> He ordered her to get up, but she told him that her rheumatoid arthritis prevented her from doing so, unless he untied her hands. The assailant then

---

[1] Pursuant to § 595.226.1 of the Revised Statutes of Missouri, as updated through the 2016 supplement, we use initials to identify S.N. to protect her identity. For consistency, we use initials to refer to the other victims as well.

[2] At Dixon's criminal trial, S.N. testified that Dixon asked her where the safe was and called her a liar when she said there was no safe; he called S.N. a liar several times.

[3] S.N. testified at trial that the gunman wore black gloves with the index finger cut off, and rubber surgical gloves underneath.

ordered her to put her head and chest in the chair. He pulled down her pants and proceeded to rape her vaginally and rectally.[4]

At this point, [J.S.], a guest at the hotel, entered the office. He encountered a man dressed in dark clothing and asked for change. Instead, the gunman pointed his gun between [J.S.'s] eyes, told [J.S.] to give him his money, and threatened to kill him. [J.S.] gave him the two dollars he had, and then the gunman told [J.S.] to lie on the office floor and again threatened to kill him. As [J.S.] crawled around behind the front desk, he saw a woman, whose hands were tied together, lying on the floor. The gunman then tied [J.S.'s] hands together. Within a few minutes, [J.N.], a man staying with [J.S.] at the hotel, was also brought into the room by the gunman and was told to lie on the floor.[5] The gunman tied up [J.N.] and then left, after announcing his intention to check some of the hotel rooms. [S.N.] and [J.N.] managed to get loose after 10 or 15 minutes and called the police.

[J.S.], who initially saw the gunman behind the front desk with his sock cap rolled up above his eyes, was interviewed by the police in an effort to obtain a composite drawing of the suspect.[6] Approximately three weeks after the incident, the police showed [J.S.] a photographic line-up. [J.S.] immediately identified the defendant as the gunman from a photo array. [J.S.] also identified the defendant's voice from an audiotape that contained the voices of five or six individuals. Subsequently, [S.N.] listened to the same audiotape and when she heard the third voice, she began to shake, cry and perspire. She listened to the remaining voices, and then identified the third voice on the tape as the voice of her attacker.[7]

*Id.* at 254.

By agreement of the parties, the sentencing court ordered post-conviction DNA testing pursuant to § 547.035.[8] Based on the testing performed and results generated by Bode Cellmark

---

[4] The man ejaculated when he penetrated S.N. rectally, but he used a condom, which he removed manually from her.

[5] J.S. and J.N. were staying in a motel room with two other men and there was no evidence of what either of them had been doing prior to the encounter with the gunman.

[6] J.S. testified that the front desk area was well lit and Dixon was standing about a foot and a half away. J.S. also testified that he could see Dixon's face for about five minutes.

[7] The third voice on the tape belonged to Dixon. *State v. Dixon*, 969 S.W.2d 252, 259 (Mo. App. W.D. 1998).

[8] All statutory citations are to the Revised Statutes of Missouri, as updated through the 2016 supplement, unless otherwise noted. Section 547.035 provides: "A person in the custody of the department of corrections claiming that forensic DNA testing will demonstrate the person's innocence of the crime for which the person is in custody may file a post[-]conviction motion in the sentencing court seeking such testing." § 547.035.1. "The court shall order appropriate testing if the court finds: (1) [a] reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing; and (2) [t]hat movant is entitled to relief." § 547.035.7.

Forensics (Cellmark), an accredited laboratory, Dixon filed the present motion for release under § 547.037.[9] The State filed an objection, and the motion court held an evidentiary hearing, at which the court took judicial notice of the underlying criminal case and heard testimony from nine witnesses.[10]

Deanna Lankford, Director of Forensic Casework at Cellmark, was recognized by the motion court as an expert in DNA testing and analysis. She testified that Cellmark tested thirteen items, eight of which were pieces of rope.[11] Due to the nature of the crimes, all of the items were tested for the presence of semen. The initial stage in the DNA testing process is the serological step, where the nature of the DNA material present is determined. Two presumptive tests for semen, the acid phosphatase test and the p30 test, were negative on all items,[12] but by swabbing the ropes and visually examining parts of the resulting liquid samples, Lankford saw one sperm head[13] in the sample produced from the rope piece labeled 07.02 and two sperm heads in the sample produced from the rope piece labeled 07.04. Because the initial screening for sperm was negative, the remaining six pieces of rope, the vaginal and anal swabs, and the three pieces of S.N.'s clothing were not tested further.

A portion of the liquid sample created by swabbing ropes 07.02 and 07.04 was examined in the initial screening. DNA testing was conducted using the remaining portions of the samples.

---

[9] "If testing ordered pursuant to section 547.035 demonstrates a person's innocence of the crime for which the person is in custody, a motion for release may be filed in the sentencing court." § 547.037.1.

[10] "If the prosecutor files a response opposing the movant's release, the court shall conduct a hearing." § 547.037.4.

[11] The motion court presumed that the pieces of rope in question were the ones used to restrain S.N., J.S., and J.N., but there was no evidence as to which of the eight pieces sent to Cellmark were used to tie up which victim. Likewise, there was no evidence regarding the history of the ropes or their chain of custody other than testimony that they were collected at the crime scene and then sent to Cellmark twenty years later. In addition to the eight pieces of rope, vaginal and anal swabs and three pieces of S.N.'s clothing went through preliminary testing to determine if sperm was present.

[12] Both tests involve exposing the sample to chemicals and observing any reaction.

[13] A sperm head is the oval anterior end of a spermatozoon, which contains the male pronucleus. Mosby's Medical Dictionary, 9th edition, 2009.

Although Lankford acknowledged that the initial microscopic screening revealed only a small quantity of sperm, she assumed that the remaining portion of the mixture used for DNA testing would have had a similar number of sperm present. Although she could not testify with 100 percent certainty, she stated that, if there are one or two sperm in a microliter of liquid, for every microliter there should be one or two sperm present.

Through a process called differential extraction, the liquid samples created from ropes 07.02 and 07.04 were separated into an epithelial fraction, made up of skin cells, and a sperm fraction. Because the differential extraction on rope 07.02 revealed an insufficient quantity of DNA for further testing, Cellmark performed additional testing on rope 07.04 only. Using autosomal testing, which identifies chromosomes that are not sex chromosomes, a DNA profile was obtained from the epithelial fraction of the sample from rope 07.04; that profile included a mixture of at least three individuals, including at least one unknown male. Using methods employed by Cellmark at the time the testing was performed, Dixon was excluded as a possible contributor to the epithelial fraction. However, Lankford testified that laboratory protocols for interpreting results from DNA mixtures had changed and that under the protocols in place at the time of the hearing she would no longer be able to draw any conclusions as to whether Dixon was a contributor to the DNA profile obtained from the epithelial fraction of the sample from rope 07.04. There was insufficient DNA on the sperm fraction to build a DNA profile during autosomal testing.

Next, Cellmark performed Y-STR testing on the epithelial and sperm fractions derived from rope 07.04; Y-STR testing isolates male DNA by targeting the Y-chromosome. Cellmark developed a partial single source profile from the sperm fraction and concluded that Dixon was excluded as the source of the DNA from that sample. J.S. and J.N. were also excluded as

contributors.[14]  With respect to the epithelial fraction, Cellmark was able to identify a partial DNA profile that was a mixture of at least two males, but Dixon was excluded.  Again, Lankford testified that under protocols in place at the time of the hearing, she would not be able to reach any conclusions about contributors to the epithelial fraction.  Lankford acknowledged that, based upon the epithelial fraction, the DNA of at least two and possibly three men was present on the rope.

Lankford also acknowledged that she could not tell how any of the DNA ended up on the rope, because anyone who touched the rope could have transferred DNA onto it and she did not know how the rope had been handled or collected.

Both the autosomal and the Y-STR tests were performed on samples created by the process of differential extraction.  Differential extraction attempts to separate sperm cells, which are heavier and denser, from lighter epithelial cells.  However, Lankford acknowledged that, during differential extraction, "You can have spillover from your sperm fraction into your epithelial fraction or spillover from epithelial fraction into your sperm fraction.  It is never a 100 percent efficient process . . . I can't say for sure what is in each fraction."  During cross-examination by the State, Lankford was asked, "we don't know for certain that that  . . . profile came from sperm, correct?"  To which Lankford responded, "Right . . . I can't say that it worked at 100 percent efficiency, so I can't say for sure."

Dr. Nancy Franklin, associate professor of Psychology at Stony Brook University, also testified and was recognized by the court as an expert on memory and identification.  The State moved to exclude Dr. Franklin's testimony as beyond the scope of § 547.037 and otherwise impermissible under Missouri law, but the motion court rejected the State's arguments because, as

---

[14] Using new protocols in place at the time of the hearing would not change Cellmark's conclusion that Dixon and the two male victims were excluded from the results of the Y-STR test of the partial DNA sample in the sperm fraction derived from rope 07.04.

the fact finder, the court determined that it would be able to distinguish admissible from inadmissible evidence. Although the motion court allowed Dr. Franklin to testify to her beliefs based on her expertise, the court precluded her from evaluating or criticizing the credibility of the identifications made in Dixon's criminal trial.[15]

Dr. Franklin testified about event-related risk factors that affect the reliability of witness identifications, including limited exposure, partial disguise, stress, weapon focus, stranger identification, and cross-race identification. As to post-event factors, she identified the delay in identification, generation of the composite, filler quality, expectation effects, police comments, and multiple exposures as factors. She also testified about the accuracy of voice identification. Based on her review of the identifications in the present case, Dr. Franklin found "the existence of risk factors associated with inaccurate identifications in this case." On cross-examination, Dr. Franklin acknowledged that she could not say that the witnesses misidentified Dixon.

The remaining witnesses testified about a similar motel robbery that had occurred in Sedalia, Missouri, approximately one month after the Harrisonville crimes.[16] Dixon objected to evidence of the Sedalia robbery as inadmissible propensity evidence, but the motion court rejected Dixon's argument because it was a bench hearing and the court concluded it would be able to distinguish the probative evidence from that which was prejudicial.[17] The court also noted that it would have heard the evidence anyway because the State would have made an offer of proof. The

---

[15] The motion court noted that the criminal trial transcript revealed "rigorous cross-examination with each of the witnesses regarding identifications and identification procedures."

[16] The initial import of the Sedalia robbery was that it led to the creation of the voice lineup that was used with witnesses in the Harrisonville case to identify Dixon.

[17] In response to Dixon's propensity evidence argument, the motion court told Dixon's attorney, "Counsel, you don't know me and I don't know you. I promise you this Court would not do that no matter what my decision is and I want you to rest assured and I want you to know this, sir, no matter how I rule on this I will not do that and you got my word on that, but go ahead."

court indicated that had the proceeding involved a jury, the court would have excluded the Sedalia evidence.

The State presented the following evidence regarding the Sedalia robbery. On the night of September 7-8, 1993, C.G. was working as the night auditor at the Knight's Court motel in Sedalia when a light-skinned black man dressed in black and wearing a mask and fingerless gloves approached the back office and pointed a gun at C.G., telling him to get down on the floor. C.G. sat down on the floor, but the man became angry and told him to lie down and put his face on the floor. The man wanted to know how to get into the cash register, and C.G. told him that the key was already in the drawer and that he needed only to turn it. The man asked how to get into the safe, but C.G. told him that he had already made the nightly deposit and could not open the safe until the general manager arrived in the morning. The man repeatedly accused C.G. of lying and insisted that C.G. was the manager and that he could access the safe. Eventually, the man asked C.G. if there were any other sources of money at the motel. C.G. explained how to get into their "back-up bank" which was like a safe deposit box that guests could use to store valuables. The man put a towel over C.G.'s head and tied his hands high up behind his back using a clothesline rope that the man had with him. When speaking to C.G., the man would put the gun to the back of C.G.'s head. At some point, the man left the motel for a period of time.

At about the same time, Pettis County police officer Kevin Bond was driving to Sedalia when he saw a vehicle, which he later learned was registered to Dixon, traveling the wrong direction on US Highway 50, heading away from the Knight's Court motel. When Bond initiated pursuit, the driver stopped the car, jumped out, and ran; Bond was unable to apprehend the driver, who Bond could see was a black male. In Dixon's car, Bond found a billfold containing Dixon's identification; a notebook belonging to Dixon; an attaché case containing a personalized license

plate associated with Dixon; and maps of Sedalia, Pettis County, and Jefferson City. There were two license plates on the back of the vehicle; Dixon's personalized plate was covered by a stolen plate from Arkansas, and a matching stolen plate was on the front of the vehicle. In the vehicle, Bond also found a duffle bag containing a stocking cap with cutouts like a ski mask, surgical face masks, a single glove with the fingers cut out, a pair of heavier weight gloves, a strip of condoms, two screwdrivers, two license plate bolts, and some .38 caliber rounds.

When the gunman eventually returned to Knight's Court motel, he was out of breath and very agitated. He demanded to know how to get into the guest rooms, and C.G., who was still tied up, explained that there was a master key, which the man found. He asked C.G. how to tell which motel rooms were occupied. The man also asked C.G. for his car keys, but C.G. had accidentally locked them in his car that night. The next morning, P.K., a motel guest, reported his vehicle stolen.

That same morning, Dixon called Jefferson City, Missouri, police to a gas station where they found Dixon dressed only in a towel. Dixon told police that he had been changing clothes in a parking lot when he was robbed and his car stolen, with everything in it, including his wallet. P.K.'s car was later recovered approximately two blocks from where police found Dixon in Jefferson City. The Sedalia police prepared a voice lineup, and C.G. identified Dixon's voice. Dixon was charged and tried in connection with the Sedalia robbery; he was acquitted.

Pursuant to § 547.037.6, the motion court issued findings of fact and conclusions of law denying Dixon's motion for release. The court concluded that the DNA evidence presented by Dixon did not prove his innocence by a preponderance of the evidence. The court explained,

> The history of the rope in question is unknown.[] There were eight ropes that could have been handled by any number of individuals both prior to the robbery at the Super 8 Motel and thereafter. While the source of the multiple male individuals contributing DNA to the ropes may be unknown, the lack of identity

does not prove that [Dixon] is innocen[t]. . . . The fact that [Dixon's] DNA was not on the rope that was tested does not indicate that [he] did not commit these offenses. The identifications by [S.N.] and [J.S.] were clear and unwavering. Without any knowledge of [Dixon's] identity, each of the victims unquestionably identified [his] voice out of a lineup as the voice of the man who raped [S.N.] and robbed the Super 8 Motel. [J.S.], the only witness to see the perpetrator's face immediately identified [Dixon]. The DNA evidence simply does not overcome the unequivocal identifications in this case.

Thus, the court concluded that the DNA evidence did not prove Dixon's innocence, *i.e.*, that he did not commit the Harrisonville crimes.

The motion court found the testimony regarding the Sedalia robbery admissible as *modus operandi* evidence, noting the "incredibly detailed similarities between the [Sedalia and Harrisonville] robberies:

The perpetrator's clothing, the stocking cap pulled down with eyes cut out, the particular clothesline-like rope used to tie up the victims, the particular order and method he went about collecting money and dangling keys in front of the victims to determine the master key, the covering of their faces, questions about occupied rooms, and even [Dixon's] accusations of lying.

But, "even without the facts in Sedalia, the [c]ourt [wa]s unpersuaded by the DNA evidence presented by" Dixon.

As for Dr. Franklin's testimony, the motion court found it improper in the context of a motion for release, noting Dixon "is not entitled to question the reliability of eyewitness identification through the use of an expert witness." The court also found unpersuasive Dr. Franklin's testimony regarding the suggestive nature of the identification procedures in this case in light of this court's prior findings that the voice identification procedures were not impermissibly suggestive and admission of the voice identification was supported by sufficient evidence. *Dixon*, 969 S.W.2d at 260. Dixon appeals.[18]

---

[18] Section 547.037.6 authorizes an appeal from the court's findings and conclusions on a motion for release.

10

**Analysis**

Dixon raises four points on appeal. He claims that the motion court erred in (1) admitting testimony regarding the Sedalia robbery (Point I); (2) discounting Dr. Franklin's testimony regarding the reliability of witness identification (Point II); (3) failing to apply any standard of "innocence" under § 547.037 (Point III); and (4) denying his motion because the DNA evidence proved, by a preponderance of the evidence, that he would not have been convicted had that evidence been admitted at his criminal trial (Point IV). For ease of analysis, we address Dixon's points out of order.

## I.     Section 547.037 Motion for Release

We begin with Dixon's third and fourth points wherein he argues that the motion court erred by (1) failing to apply any standard of innocence under § 547.037 (Point III) and (2) denying his motion because the DNA testing performed on sperm detected on rope 07.04 excluded him as a contributor (Point IV).

Section 547.037.1 provides "[i]f testing ordered pursuant to section 547.035 demonstrates a person's innocence of the crime for which the person is in custody, a motion for release may be filed in the sentencing court." If the prosecutor opposes the movant's release, as was the case here, a hearing is held wherein "[t]he movant shall have the burden of proving all the allegations of the motion by a preponderance of the evidence." § 547.037.4; *Bey v. State*, 272 S.W.3d 378, 383 (Mo. App. E.D. 2008) (finding that § 547.037 "specifically and unambiguously applies the preponderance of the evidence standard."). "'Preponderance of the evidence' is defined as that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *Id*. "In determining if a party has met this standard, the finder of fact has to

11

resolve conflicting evidence and decide which position is more probable, more credible, and has greater weight." *Lincoln v. State*, 457 S.W.3d 800, 805 (Mo. App. E.D. 2014). If the motion court "finds that the testing ordered pursuant to section 547.035 demonstrates the movant's innocence of the crime for which he . . . is in custody, the court shall order the movant's release from the sentence for the crime for which the testing occurred. Otherwise, relief shall be denied the movant." § 547.037.5.

### A. Standard of Review

We will affirm the motion court's judgment regarding Dixon's motion for release "unless [the court's] findings of fact and conclusions of law are clearly erroneous." *Lincoln*, 457 S.W.3d at 804. The motion court's "[f]indings and conclusions are clearly erroneous only if, after a review of the entire record, [this court] ha[s] the definite impression that a mistake has been made." *Id*.

### B. The motion court did not err in denying Dixon's motion for release because DNA testing did not establish his innocence by a preponderance of the evidence.

In his third point relied on, Dixon states, "The hearing court erred when it *failed to apply any* standard for 'innocence' under § 547.037." (Emphasis added.) In the argument portion of his brief, Dixon contends that the motion court was required to "articulate what constitutes 'innocence' under § 547.037" and that, by failing to define "innocence," the court committed error. Dixon then offers what he believes to be the proper definition of "innocence" as that term is used in § 547.037 and contends that the court "failed to define or apply a correct standard."[19] Because we conclude that the plain and ordinary meaning of innocence applies to that term as it is used in

---

[19] Because Dixon's Point III identifies the issue only as whether the motion court applied any standard for innocence, his argument is broader than his point relied on. "Although we need not consider issues not raised in the point relied on, we will review [Dixon's broader argument] *ex gratia*." *Caranchini v. Mo. Bd. of Law Exam'rs*, 447 S.W.3d 768, 774 (Mo. App. W.D. 2014) (internal citation omitted).

§ 547.037, the motion court did not err when it defined and applied the standard by determining whether Dixon proved, by a preponderance of the evidence, that he did not commit the crimes.

As Dixon points out, § 547.037 does not define "innocence." In the absence of a statutory definition, "[w]e must give the requirements under § 547.037 their plain, ordinary meaning." *State v. Spencer*, 569 S.W.3d 477, 481 (Mo. App. E.D. 2018). Black's Law Dictionary defines "Innocent" as "Free from guilt." *Innocent*, BLACK'S LAW DICTIONARY (10th ed. 2014). Thus, the standard imposed by § 547.037 is whether the movant proved, by a preponderance of the evidence, that he was free from guilt of the crimes charged.

Dixon argues that the appropriate standard is whether he was more likely than not to have been convicted if the DNA evidence had been admitted at trial. Dixon's proposed standard of innocence is based on § 547.035, which specifies the showing a movant must make to be entitled to post-conviction DNA testing. In order to obtain such testing, the defendant must allege facts demonstrating, among other things, that there is a "reasonable probability . . . that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing." § 547.035.2(5). Dixon's argument is unpersuasive because, like § 547.037, § 547.035 does not define the term "innocence" or suggest that the term should be given anything other than its plain and ordinary meaning in this context. In addition, had the Missouri Legislature intended the term "innocence" as used in § 547.037 to mean whether the defendant was more likely than not to have been convicted if the DNA evidence had been admitted at trial, the legislature could have used that language in § 547.037 as it did in § 547.035.2(5). The plain meaning of the language of § 547.037 and § 547.035.2(5) is that the legislature established a less stringent standard for when a DNA test can be ordered than the standard by which the court, based on the DNA test

13

results, decides to release the movant from the underlying sentence.[20] It is clear from the judgment denying Dixon's motion that the court focused on whether the DNA test results established that Dixon was more likely than not free from guilt in connection with the Harrisonville crimes. In explaining its decision, the court stated, "The fact that [Dixon's] DNA was not on the rope that was tested does not indicate that [he] did not commit these offenses. The identifications by S.N. and J.S. were clear and unwavering. . . . The DNA evidence simply does not overcome the unequivocal identifications in this case." Thus, the motion court articulated and applied the correct standard of innocence in denying Dixon's motion.

Point III is denied.

Having determined that the motion court applied the appropriate standard in ruling on Dixon's motion, the question becomes whether the motion court clearly erred in reaching its decision. Dixon contends that the DNA evidence proves his innocence, and thus, the motion court clearly erred in denying his motion. We disagree.

Dixon was convicted of the Harrisonville crimes based primarily on what the motion court described as the "clear and unwavering" identifications made by S.N. and J.S. At trial, J.S. testified that the motel lobby was well lit, Dixon was standing about a foot and a half away, and J.S. could see Dixon's face for about five minutes. J.S. immediately identified Dixon in a photo lineup. J.S. also identified Dixon's voice from a voice lineup. When S.N. listened to the same voice lineup, she began to shake, cry, and perspire when she heard Dixon's voice. She then identified Dixon's voice as that of the perpetrator. Therefore, the issue for the motion court was whether the DNA evidence was of greater weight or more convincing than the eyewitness testimony at trial. Stated

---

[20] The legislature's intention to create two different standards is evident in its use of "reasonable probability" in § 547.035 versus "preponderance of the evidence" in § 547.037. The former need not be a greater-than-fifty-percent chance; whereas the latter must be.

otherwise, the question the court faced was whether the evidence, as a whole, proved that, more likely than not, Dixon did not commit the crimes at issue.

The DNA evidence was a single-source, Y-STR partial DNA profile obtained from the sperm fraction of a liquid sample created from one piece of rope (07.04) found at the crime scene. The motion court evaluated the strength and import of that evidence compared to the evidence of Dixon's guilt at trial—namely the identification evidence. There are factors that undercut the weight to be given the DNA test results and call into question whether the DNA found in the sperm fraction could have been deposited by only the perpetrator of the rape and sodomy at the Harrisonville Super 8 Motel.

The presence of sperm on rope 07.04 was determined by microscopic examination of a portion of the liquid sample created by swabbing that piece of rope. Lankford acknowledged that only a very small amount of sperm was present (two sperm heads) in the sample subject to visual examination and that, while she would assume a similar amount of sperm would be present in the portion of the sample used to perform the DNA test, she could not be certain of that. Another liquid sample obtained from rope 07.02, where one sperm head was observed, contained inadequate genetic material to allow for testing and the liquid sample created from rope 07.02 was insufficient to perform autosomal testing. Relevant to the weight given the DNA test result on rope 07.04 is the fact that the sample used for DNA testing was created by differential extraction; a process used to separate heavier, denser sperm cells from other cells. During differential extraction, "spillover" can occur between the epithelial and the sperm fractions, and thus Lankford testified that she could "not say for sure what is in each fraction." The testing revealed the presence of male DNA in the epithelial portion. Thus, the potential effect of spillover of cells from the epithelial fraction to the sperm fraction is relevant to the weight the motion court gave to this

15

evidence. When asked, Lankford confirmed her uncertainty that the DNA profile tested came from sperm, saying "I can't say for sure."

Further, at the time the testing was done, no attempt was made to compare the epithelial fraction to the sperm fraction to determine if any of the male DNA that appeared in the epithelial sample matched the DNA found in the sperm fraction. And, because of changes in testing protocol for mixed samples, the sperm fraction could no longer be compared to the mixed epithelial fraction. In oral argument, Dixon claimed that any spillover from the epithelial fraction to the sperm fraction could not have affected the validity of the Y-STR partial DNA profile obtained from the sperm fraction because the epithelial fraction contained mixed DNA (contributed by more than one person) while the partial DNA profile from sperm fraction involved only a single source DNA and thus genetic material from the epithelial fraction could not have affected the DNA results from the sperm fraction. But there is nothing in Lankford's testimony or otherwise in the record that supports this conclusion. And Dixon bore the burden of demonstrating his innocence under § 547.037.

Further, the evidence does not prove, as Dixon suggests, that any sperm present on rope 07.04 must have come from the perpetrator of the rape and sodomy at the Harrisonville Super 8. As the motion court noted, there was no evidence regarding the history of the rope, which piece of rope was used to restrain which victim, or even whether every piece of rope found at the crime scene had been used by the perpetrator when committing the crimes. *See Lincoln*, 457 S.W.3d at 804 (finding that lack of a DNA match to hair found on a blanket at the crime scene did not exonerate movant where there was no evidence as to "where [the blanket] came from, how long it had been in the house, or who had contact with it outside the date of the murder."). Dixon argues that the presence of sperm on rope 07.04 can be explained only by the conclusion that sperm

16

got on the perpetrator's gloved hand when he removed the condom from the victim and the sperm was then transferred to the rope when he tied up the male victims. But this is not the only possible explanation for the presence of sperm on the rope. That the perpetrator wore gloves and a condom could mean that he left no DNA evidence at the scene. That, in combination with the fact that the eight pieces of rope sent to Cellmark for testing could have been handled by any number of individuals both before and after the Harrisonville crimes, means that the fact that Dixon was not the source of the sperm found on rope 07.04, does not necessarily mean that he was not the perpetrator of the crimes.

No semen or sperm was collected at the crime scene or on any evidence collected there, except for ropes 07.02 and 07.04. No further testing was performed on rope 07.02 due to insufficient DNA and, thus, Dixon could not be excluded as a source of the sperm on rope 07.02. Significantly, the whereabouts and handling of the rope before the Harrisonville crimes are unknown. The rope could have been handled by any number of people before the crimes, and the small amount of DNA material detected on one piece of the rope could have been transferred there in a number of ways. Lankford could not say when or how sperm was deposited on rope 07.04.

After weighing the evidence, the motion court concluded that Dixon's exclusion as a contributor to the DNA detected on rope 07.04 "simply does not overcome the unequivocal identifications in this case." And, after reviewing the entire record, we are not left with a definite impression that the motion court made a mistake in reaching that conclusion. Thus, the motion court did not clearly err in denying Dixon's motion for release.

Point IV is denied.

17

## II. Evidentiary Rulings

In his remaining two points on appeal, Dixon argues that the motion court erred in (1) admitting testimony regarding the Sedalia crimes (Point I) and (2) discounting Dr. Franklin's testimony regarding the reliability of photo and voice identification (Point II).

### A. The motion court did not commit reversible error in admitting testimony regarding the Sedalia crimes.

The parties disagree about the appropriate standard of review. The State argues that "[w]e review a trial court's decision to admit evidence for an abuse of discretion." *State v. Betts*, 559 S.W.3d 47, 57 (Mo. App. E.D. 2018). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it, and is so unreasonable as to indicate a lack of careful consideration." *Id.* "If an abuse of discretion is found, we will reverse only where the error resulted in prejudice so substantial that it deprived the defendant of a fair trial." *Id.* Dixon argues that § 547.037 prohibits the introduction and consideration of additional evidence not presented at the original trial (other than the result of DNA testing ordered pursuant to § 547.035), and thus, the abuse-of-discretion standard is inapplicable in this context. We need not resolve this issue, however, because whether the motion court erred in admitting the Sedalia evidence, because the court either abused its discretion or exceeded the scope of § 547.037, Dixon must show that he was prejudiced by the error, which he is unable to do.

"Trial court error in the admission of evidence is prejudicial if the error so influenced the [fact finder] that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the [fact finder] would have reached a different conclusion without the error." *State v. Ellis*, 512 S.W.3d 816, 825 (Mo. App. W.D. 2016) (quoting *State v. Miller*, 372 S.W.3d 455, 472 (Mo. banc 2012)) (emphasis removed). "In a bench trial, error in admitting evidence is generally not prejudicial, unless the trial court relies on the inadmissible

18

evidence in making its findings." *State v. Hein*, 553 S.W.3d 893, 898 (Mo. App. E.D. 2018). On appeal, we presume that any improper or inadmissible evidence admitted in a bench-tried case "was not prejudicial and that the trial court was not influenced by it in reaching its judgment unless it is apparent from the record that the trial court considered and relied on the improper or inadmissible evidence." *State v. Chandler*, 429 S.W.3d 503, 507 (Mo. App. E.D. 2014).

Here, the motion court determined that evidence of the Sedalia robbery was admissible as *modus operandi* evidence. But Dixon was not prejudiced by the admission of the evidence because, ultimately, the court would have denied Dixon's motion even without the Sedalia evidence. Thus, even if the court erred in admitting the Sedalia evidence, Dixon cannot show that he was prejudiced by its consideration. Considering the strength of the evidence supporting Dixon's conviction, we accept the motion court's assertion that it would have rejected Dixon's motion even absent the Sedalia evidence.[21]

Point I is denied.

### B. The motion court did not err in discounting Dr. Franklin's testimony regarding the reliability of eyewitness and voice identification.

As a general principle, "defendants are not entitled to offer expert testimony as to the general unreliability of [eyewitness identification and], the admission of such evidence lies within the sound discretion of the trial court." *State v. Body*, 366 S.W.3d 625, 629 (Mo. App. E.D. 2012); *State v. Ware*, 326 S.W.3d 512, 528-29 (Mo. App. S.D. 2010) (expert testimony concerning the reliability of eyewitness identification properly excluded); *State v. Allen*, 274 S.W.3d 514, 526-27 (Mo. App. W.D. 2008) (finding no abuse of discretion in excluding expert testimony regarding mistaken identification). Such testimony may be excluded on grounds that the fact finder may use

---

[21] Because Dixon cannot show that he was prejudiced, we need not address his theories for why evidence regarding the Sedalia crimes should not have been admitted.

its own experience to reach a judgment about the credibility of a witness's identification. *Id*. at 526.

Thus, even if the evidence Dixon offered from Dr. Franklin were admissible—a determination we do not make—it would still be within the motion court's discretion to reject the testimony. Here, the motion court found Dr. Franklin's testimony unpersuasive, particularly in light of what the motion court described as "rigorous cross-examination [at trial] with each of the witnesses regarding identifications and identification procedures" and this court's prior determination that the voice identification procedures were not impermissibly suggestive. *Dixon*, 969 S.W.2d at 260. "Determinations concerning credibility are exclusively for the motion court and it is free to believe or disbelieve any evidence, whether contradicted or undisputed." *Hudson v. State*, 563 S.W.3d 834, 839 (Mo. App. E.D. 2018) (quoting *Flenoy v. State*, 446 S.W.3d 297, 303 (Mo. App. W.D. 2014)). Accordingly, the motion court did not err in discounting Dr. Franklin's testimony.

Point II is denied.

## Conclusion

The motion court did not clearly err in denying Dixon's motion for release. Its judgment is affirmed.

Karen King Mitchell, Chief Judge

Anthony Rex Gabbert, Judge, and Timothy J. Flook, Special Judge, concur.